UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**MARYBETH M. DONLICK,**

                         **Plaintiff,**

             v.                                    3:16-CV-617
                                                              (FJS/DEP)

**STANDARD INSURANCE COMPANY,**
*f/k/a StanCorp Financial Group, Inc.*,

                         **Defendant.**
_____

**APPEARANCES**                              **OF COUNSEL**

**OFFICE OF RONALD R. BENJAMIN**      **RONALD R. BENJAMIN, ESQ.**
126 Riverside Drive
P.O. Box 607
Binghamton, New York 13902-0607
Attorneys for Plaintiff

**PIERCE ATWOOD, LLP**                 **BROOKS R. MAGRATTEN, ESQ.**
72 Pine Street                                   **MICHELE E. KENNEY, ESQ.**
Providence, Rhode Island 02903
       - and -
One New Hampshire Avenue, Suite 350
Portsmouth, New Hampshire 03801
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff filed this action on or around May 5, 2016, in New York Supreme Court, County of Broome, by summons and complaint, seeking to have Defendant's disability determination

reviewed pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(b). Defendant removed the action to this Court. *See* Dkt. No. 1. Pending before the Court are the parties' cross-motions for summary judgment, *see* Dkt. Nos. 21, 24, and Plaintiff's motion to submit evidence outside the administrative record, *see* Dkt. No. 24.

## II. BACKGROUND

Defendant Standard Insurance Company administered an employee benefit plan ("the Plan"), which provided long term disability ("LTD") benefits. Defendant was "delegated the full and exclusive authority to control and manage the Plan, to administer claims, and interpret Plan provisions, including the right to determine entitlement to benefits." *See* Dkt. No. 21-2 at ¶ 1.

Plaintiff Marybeth Donlick formerly worked as a truck driver for Chesapeake Energy Corporation. *See id*. at ¶ 9. On August, 7, 2012, she was injured in a motorcycle accident that resulted in an amputation below her right knee, left ankle fracture, and back wounds. *See id*. at ¶ 10. Plaintiff applied for LTD benefits in December 2012 after sustaining these injuries. *See id.* at ¶ 22.

Initially, Plaintiff bore the burden of proving that she had an injury that rendered her unable to perform the "Material Duties" of her "Own Occupation." *See id.* at ¶ 6. The Plan defines "Material Duties" as "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted." *See id*. at ¶ 8. Further, the Plan defines "Own Occupation" as "any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation

you are regularly performing for your Employer when Disability begins." *See* Administrative Record ("AR") at 831.

On January 16, 2013, Defendant approved Plaintiff's claims for LTD benefits and began paying her $779.80 per month as of March 4, 2013. *See* Dkt. No. 21-2 at ¶ 27. The benefit approval letter explained that Defendant would periodically confirm Plaintiff's continued disability and eligibility for benefits and advised her that it was her responsibility to provide updated medical information. *See id.* at ¶ 28. Importantly, it also explained the policy's definition of disability would change from the "own occupation" to the "any occupation" standard, which would require a review of her claim. *See id.* at ¶ 29. In total, Defendant paid Plaintiff more than $20,000 in LTD benefits.

After paying LTD benefits for 24 months, Defendant reevaluated Plaintiff's claim under the "any occupation" standard. *See id*. at ¶ 47. Under the Plan, "Any Occupation" means

> any occupation or employment which you are able to perform, whether due to education, training, or experience which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

*See* AR at 831.

To determine whether Plaintiff was disabled under the "any occupation" standard, Defendant ordered a medical records review from an orthopedic physician and consulted a vocational expert. Ultimately, Defendant determined that Plaintiff's LTD benefits would terminate because she did not satisfy the "Any Occupation" definition of disability. *See id*. at ¶ 72. Plaintiff appealed Defendant's decision and submitted a one-page letter and a report from a vocational expert opining that she was unemployable in any occupation. *See id*. at ¶ 82.

On appeal, Defendant re-evaluated Plaintiff's file and consulted an additional orthopedic specialist as well as an additional vocational expert. The vocational expert considered the report Plaintiff provided but disagreed with its conclusions and identified other positions that Plaintiff could perform. *See id.* at ¶ 90. Thereafter, on March 15, 2016, Defendant sent a letter informing Plaintiff that it was upholding its determination that she no longer qualified for benefits. *See id.* at ¶ 92. Plaintiff then filed this action.

### III. DISCUSSION

**A.     Standard of review**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the movant meets this burden, the nonmoving party must """set forth specific facts showing a genuine issue for trial.""" *Id.* (quotation omitted).

The parties agree that "[s]ummary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA." *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07 Civ. 9661, 2009 WL 222351, *12 (S.D.N.Y. Jan. 30, 2009) (citations omitted). "In such an action 'the contours guiding the court's disposition of the

summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.'" *Id*. (quoting *Ludwig v. NYNEX Service Co*., 838 F. Supp. 769, 780 (S.D.N.Y. 1993)). In that regard, the parties disagree on the standard governing this Court's review of Defendant's disability benefits decision under ERISA.

The Supreme Court first articulated the standard governing a court's review of an administrator's interpretation of an ERISA benefit plan in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). In *Firestone*, the Court explained that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115. "Where such authority is given, the administrator's interpretation is reviewed for an abuse of discretion." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 130 (2d Cir. 2008) (citing [*Firestone*, 489 U.S.] at 115, 109 S. Ct. 948). Here, there is no dispute that Defendant has the exclusive authority to determine eligibility and to construe the terms of the Plan. *See* Dkt. No. 21-2, Def.'s Statement of Mat. Facts, at ¶ 1; Dkt. No. 24-1, Pl.'s Counter Statement of Mat. Facts, at ¶ 1.

Nevertheless, Plaintiff asserts that Defendant's conflict of interest requires the Court to conduct a *de novo* review. However, following the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Second Circuit made clear that "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate." *McCauley*, 551 F.3d at 133 (citing *Glenn,* [554 U.S. at 111,] 128 S. Ct. at 2348). "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation." *Id.* (citing *Glenn,* [554 U.S. at 111,] 128 S. Ct. at 2348). Thus, rather than change this Court's standard of review,

Defendant's conflict of interest is a factor that the Court must consider when reviewing Defendant's benefits decision.

Plaintiff's arguments to the contrary are unpersuasive. First, Plaintiff's citation to *Waksman* is erroneous as that decision clearly acknowledged that a conflict of interest alone is insufficient to warrant *de novo* review. *See Waksman v. IBM Separation Allowance Plan*, 138 F. App'x 370, 371 (2d Cir. 2005) (summary order) (stating that "[t]he mere fact that the administrator is employed by a party that could suffer financially under the administrator's decision is not enough to lessen the deference due to the administrator" (citations omitted)).

Furthermore, Plaintiff argues that Defendant failed to comply with DOL regulations in denying her claim. *See* Dkt. No. 24-8 at 7. Plaintiff contends that the regulations require a "meaningful dialogue between the plan administrator and their beneficiaries." *See* Dkt. No. 24-6 at 7. Plaintiff argues that she received a letter from Defendant's employee Shannon Teed that asked her to contact her, and she called back but never received a return call. *See id.* Therefore, according to Plaintiff, Ms. Teed's failure to return her call violated 29 C.F.R. § 2560.503-1(f)(2)(iii)(B). This regulation provides that,

> [i]n the case of a post-service claim, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30–day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision. If such an extension is necessary due to a failure of the claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

29 C.F.R. § 2560.503-1(f)(2)(iii)(B).

The Second Circuit has held that "a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed *de novo* in federal court[.]" *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 57-58 (2d Cir. 2016). However, as Defendant points out, the only regulation with which Plaintiff alleges Defendant failed to comply pertains to Group Health Plans, not disability benefits plans. Further, it is difficult to understand how Defendant's alleged failure to return Plaintiff's phone call violates this, or any other, regulation.[1]

Moreover, Plaintiff argues that the Court should review Defendant's decision *de novo* because Defendant erred in assigning weight to the different types of records that it reviewed. *See* Dkt. No. 24-8 at 7 (citing *Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*, __ F. Supp. 3d __, No. 514CV1403, 2016 WL 6820464 (N.D.N.Y. Nov. 15, 2016)). However, like Plaintiff's citation to *Waksman*, her citation to *Easter* provides no support for her overall contention. Rather, the court in *Easter* reviewed the plan's decision *de novo* because the plan administrator failed to comply with DOL regulations. *See Easter v. Cayuga Med. Ctr. at Ithaca*

---

[1] Although *Halo* held that the plan administrator has the burden to prove which standard of review to apply, surely that burden does not require that a defendant affirmatively show that it complied with DOL regulations when the plaintiff makes no showing to the contrary. Rather, a fair reading of *Halo* requires only that the administrator show that it had discretionary authority to administer the plan; and its burden to prove compliance with DOL regulations arises, if it ever arises, only after a plaintiff makes a reasonable showing that the defendant violated DOL rules. *See, e.g., Schuman v. Aetna Life Ins. Co.*, No. 3:15-CV-1006, 2017 WL 1053853, *15 (D. Conn. Mar. 20, 2017) (considering whether the plan complied with regulations only insofar as the plaintiff raised "genuine issues regarding whether his claims determination was decided in a manner consistent with the claims-procedure regulations").

In any event, Defendant had ample contact with Plaintiff regarding its review of her claims, and it fully explained the information it sought to make an accurate disability determination. *See* AR at 356, 435-44.

*Prepaid Health Plan*, No. 5:14-CV-1403, ___ F. Supp. 3d ___, 2016 WL 6820464, *17 (N.D.N.Y. Nov. 15, 2016).

Finally, Plaintiff argues that Defendant, or the reviewing physicians, should have obtained additional medical reports regarding Plaintiff's difficulty fitting in a prosthesis and should have ordered an IME. *See* Dkt. No. 24-8 at 7-8. However, it was Plaintiff's responsibility to provide the relevant medical reports. Indeed, Plaintiff notes that "[a] combination of plaintiff's lack of communication skills and perhaps her counsel's failure to properly probe into the actual treatment resulted in none of the prosthetic records be (sic) made part of the administrative record." *See id*. at 8.

Based on the foregoing, the Court concludes that *de novo* review is not appropriate in this case; and, therefore, the Court will review Defendant's decision under a deferential standard, meaning that this Court "may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *McCauley*, 551 F.3d at 132 (quoting *Pagan [v. NYNEX Pension Plan]*, 52 F.3d [438,] 442 [(2d Cir. 1995)]).

**B.      Evidence outside administrative record**

Plaintiff argues that she has shown "good cause" for why the Court should go beyond the administrative record in this case and review the evidence that she has submitted for the first time to this Court. The new evidence includes (1) Plaintiff's Affidavit, *see* Dkt. No. 24-3, "Ex. A"; (2) Plaintiff's annotation to a February 24, 2015 letter, *see* Dkt. No. 24-4, "Ex. B"; (3) a January 23, 2017, letter from prosthetist Jeffrey Tyo, *see* Dkt. No. 24-5, "Ex. C"; and (4) new medical reports from Mr. Tyo, *see* Dkt. No. 24-6, "Ex. D."

Defendant, to the contrary, argues that, "[w]hen the arbitrary and capricious standard of review applies, a district court is limited in the scope of its evidentiary review and may consider only the administrative record that was before the fiduciary at the time of its claims decision." *See* Dkt. No. 26 at 2 (citing *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995)). In that regard, *Miller* held "that a district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995). The Second Circuit in *Miller* reasoned that "[t]his rule is consistent with the fact that nothing 'in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators' and with the ERISA 'goal of prompt resolution of claims by the fiduciary.'" *Id.* (quotation omitted). However, the case law that post-dates *Miller* has called into question the impact that this statement in *Miller* has on determining whether to admit extrinsic evidence upon a showing of "good cause" for cases under the arbitrary and capricious standard of review. *See, e.g., Demonchaux v. Unitedhealthcare Oxford*, No. 10 Civ. 4491, 2012 WL 6700017, *11 (S.D.N.Y. Dec. 20, 2012) (finding that, "[i]n ERISA cases applying arbitrary and capricious review, 'a district court's decision to admit evidence outside the administrative record is discretionary . . . .'" (quoting *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (applying arbitrary and capricious review to Defendant's refusal to reimburse Plaintiff's surgery expenses, and admitting evidence outside administrative record))) (other citations omitted); *Biomed Pharms., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 831 F. Supp. 2d 651, 658 (S.D.N.Y. 2011) (stating that, "[w]hile it is true that a court's review of an ERISA claim under an arbitrary and capricious standard is generally limited to evidence in the administrative record, the court has 'discretion to admit evidence outside the record upon a showing of "good cause"'" (quotation omitted)); *Ramsteck v. Aetna Life Ins. Co.*, No. 08 Civ. 12,

2009 WL 1796999, *7 (E.D.N.Y. June 24, 2009) (stating that, "[w]hile '[t]he decision whether to consider evidence from outside the administrative record is within the discretion of the district court[,] the presumption is that judicial review "is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence"'" (quotation and other citations omitted)).

In any event, even if the Court were to find it appropriate to admit additional evidence upon a showing of "good cause," Plaintiff has failed to make such a showing. Although a defendant's demonstrated conflict of interest may be an example of good cause, *see DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66-67 (2d Cir. 1997), "a conflicted administrator does not *per se* constitute good cause, and . . . a finding of a conflicted administrator alone should not be translated *necessarily* into a finding of good cause[,]" *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004). Rather, "'good cause' exists when the procedures employed in arriving at the claim determination were flawed, and when an insurer's claimed reason for denying a claim was not stated in its notices to the claimant." *Biomed Pharms., Inc.*, 831 F. Supp. 2d at 658-59 (citing *Locher*, 389 F.3d at 295) (footnote omitted). Furthermore, "good cause" may exist when there are "insufficient procedures for internal or appellate review." *Locher*, 389 F.3d at 295.

Plaintiff argues that Defendant's structural conflict of interest justifies going outside the administrative record. For example, Plaintiff argues that Defendant hired medical experts who "failed to give even a passing glance" to her difficulty in finding a workable prosthesis. *See* Dkt. No. 24-8 at 10. Furthermore, Plaintiff faults Defendant for failing to order an IME. Moreover, Plaintiff alleges that, "with an eye toward terminating [her] long-term disability benefits[,]

[D]efendant went out to hire a vocational expert to review Pearson's report[.]" *See id.* at 11. In sum, Plaintiff argues that the

> weight defendant afforded to its own hired experts while disregarding or rejecting the opinions of plaintiff's attending physicians, Pearson,[2] the Social Security Administration, and the commonsense realities that the inability to fit plaintiff for a prosthesis she can use regularly are sufficient to show a potential conflict of interest that would favor the Court exercising its discretion to hear evidence outside the administrative record.

*See id.* at 12 (citing *Trussel v. Cigna Life Ins. Co. of N.Y.*, 552 F. Supp. 2d 387, 392 (S.D.N.Y. 2008)).

Plaintiff's allegations are devoid of specifics and amount to no more than conclusory attacks on Defendant's ultimate decision. For example, Plaintiff argues that Defendant erred in weighing the opinions of the medical reviewers over those of her attending physicians; however, she fails to specify how the medical records from her attending physicians contradict the opinions of the medical consultants. In sum, Plaintiff has not established "good cause" to go beyond the administrative record; and, therefore, the Court will confine itself to the Administrative Record when considering whether Defendant's decision was arbitrary and capricious.

## C. The Plan's decision

### *1. Arbitrary and capricious standard and weight to assign structural conflict*

"A denial of a claim challenged under § 502(a)(1)(B) is arbitrary and capricious if 'there has been a clear error of judgment,' . . . that is, if the decision was '"without reason, unsupported

---

[2] On several occasions Plaintiff refers to Mr. Pearson as Dr. Pearson. *See, e.g.,* Dkt. No. 24-8 at 8, 10, 11. However, his CV makes clear that his highest level of education is a Masters degree. *See* Dkt. No. 24-7 at 19.

by substantial evidence or erroneous as a matter of law[.]"'" *Miller*, 72 F.3d at 1072 (quotations omitted). "Substantial evidence in turn 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance.'" *Id*. (quotation omitted).

In the first instance, because Defendant undoubtedly operated under a conflict of interest, the Court must consider whether, if at all, that conflict influenced its ultimate decision. *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009). "Evidence that a conflict affected a decision may be categorical (such as 'a history of biased claims administration') or case specific (such as an administrator's deceptive or unreasonable conduct), and may have bearing also on whether a particular decision is arbitrary and capricious." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 140 (2d Cir. 2010) (citations omitted). However, "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Id*. (citation omitted).

To support her position that the conflict impacted Defendant's decision, Plaintiff argues that Defendant impermissibly weighed the opinions of its hired experts over the opinions of her attending physicians, her vocational expert, and the Social Security Administration's determination. *See* Dkt. No. 24-8 at 12. Furthermore, she reiterates her erroneous claim that Defendant violated DOL regulations. *See id*. However, as discussed above, Plaintiff's arguments are unsubstantiated. In sum, Plaintiff has provided no reason to suspect that the structural conflict influenced Defendant's decision. Therefore, the Court will give no weight to Defendant's structural conflict of interest when evaluating whether its decision was arbitrary and capricious.

### *2. Defendant's decision[3]*

The Plan places the burden of providing proof of continued disability on Plaintiff. *See* Dkt. No. 21-2 at ¶ 5. Initially, to receive benefits, Plaintiff only had to prove that she had a physical injury that rendered her unable to perform the "material duties" of her "own occupation" as the Plan defined those terms. *See id.* at ¶ 6. Plaintiff applied for benefits in December 2012. On January 16, 2013, Defendant approved Plaintiff's claim for LTD benefits and began to pay her $779.80 per month as of March 4, 2013. *See id.* at ¶ 27.

In the benefit approval letter, Defendant explained that it would review Plaintiff's claim periodically to confirm her continued disability and also indicated that "[a]fter a period of time the definition of disability may change, which would require a review of [her] claim." *See id.* at ¶¶ 28-29 (citing AR at 410).

After paying Plaintiff LTD benefits for twenty-four months, the Plan required Plaintiff to prove that she had a physical injury that rendered her unable to perform the "material duties" of "any occupation." *See id.* at ¶ 7. The Plan defines "Any Occupation," as

> any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.

*See id*. at ¶ 8.

On May 14, 2014, Defendant sent Plaintiff a letter explaining that her first 24 months of disability benefits would end on February 3, 2015. *See* AR at 380. The letter explained how

---

[3] The Court's citations in this section are to Defendant's uncontroverted statement of material facts, *see* Dkt. No. 21-2, and the Administrative Record, *see* Dkt. No. 21-4, "AR."

Plaintiff's claim would be evaluated and invited her to produce any medical or vocational information that she would like Defendant to consider. *See id.* In response, Plaintiff filled out an Education, Training, and Experience form that she received from Defendant. *See* AR at 664.

As part of Defendant's evaluation, Dr. Joseph Mandiberg reviewed Plaintiff's medical records on May 8, 2014. *See* AR at 319. Dr. Mandiberg opined that Plaintiff was "not a candidate for a medium level occupation in the future," however "[s]he will be capable of performing a sedentary level occupation." *See id.*

Furthermore, on May 11, 2015, Dr. James Roe reviewed all of Plaintiff's medical information, including updated records received after Dr. Mandiberg's review, and everything that was before the Social Security Administration. *See* AR at 110. These records included the following:

(1) September 11, 2012 discharge summary noting that Plaintiff had been involved in a motor vehicle accident on August 7, 2012, and suffered a traumatic right below-the-knee amputation, a left ankle fracture, right and left elbow abrasions and fractures of the transverse processes of L2 through L4

(2) October 15, 2012 discharge summary from the rehabilitation unit, noting treatment

(3) October 16, 2012 outpatient visit with Dr. Iannolo

(4) October 24, 2012 consultation with Dr. Harley due to poor wound healing on the amputation stump

(5) November 30, 2012 consultation with Dr. Harley noting satisfactory progress

(6) January 5, 2013 office visit with Dr. Iannolo

(7) February 20, 2013 office visit with Dr. Iannolo

(8) March 25, 2013 office visit with Dr. Iannolo

(9) May 10, 2013 office visit with Dr. Iannolo

(10)  June 17, 2013 office visit with Dr. Iannolo regarding prosthetist

(11)  June 18, 2013 operative note with Dr. Iannolo to repair, right fibular nonunion and neuroplasty, right peroneal nerve

(12)  July 17, 2013 postop visit with Dr. Iannolo

(13)  August, 12, 2013 office visit with Dr. Iannolo

(14)  October 24, 2013 office visit with Dr. Iannolo regarding difficulty healing and finding a prosthesis that fit[4]

(15)  February 20, 2014 operative report regarding open reduction internal fixation of right lateral tibial plateau fracture suffered as a result of a dog attack

(16)  March 20, 2014 postop visit with Dr. Iannolo

(17)  April 7, 2014 musculoskeletal questionnaire/Attending Physician Statement from Dr. Iannolo

(18)  April 11, 2014 office visit with Dr. Iannolo indicating "no pain in the right leg"

(19)  May 20, 2014 office visit with Dr. Iannolo

(20) July 28, 2014 office visit with Dr. Iannolo

*See* AR at 110-12. Furthermore, Dr. Roe reviewed documents from the Social Security Administration, including a Functional Capacity Evaluation, "multiple other Social Security

---

[4] Dr. Roe noted that there was a gap in the records after October 2013, with the next record regarding a February 13, 2014 dog attack, where Plaintiff suffered some lacerations on her arms and a depression fracture of the right lateral tibial plateau. *See* AR at 112.

documents in September and October 2012," notes regarding physical therapy, and notes from prosthetist, John Tyo.[5]  *See* AR at 113.

Dr. Roe noted that Plaintiff's functional limitations included an inability to stand, walk, balance, bend, walk on uneven surfaces, kneel, crawl, or climb.  *See* AR at 113.  However, Dr. Roe opined that Plaintiff could lift and/or push and pull 1-10 pounds frequently and 11-20 pounds occasionally.  *See* AR at 114.  Dr. Roe also posited that Plaintiff could carry 1-10 pounds occasionally and had no limitations with hand use with regard to simple grasping, pushing, pulling, fine manipulation, or finger dexterity.  *See id*.

Dr. Roe concluded that "[t]he available medical information describes a claimant with a satisfactorily healed right below-knee amputation, with a prosthesis that is wearable.  Claimant is capable of working full time in a sedentary occupation."  *See* AR at 115.  Dr. Roe added that the last record from the operative surgeon noted that Plaintiff "is taking no pain medications, has well-healed wounds over the amputation site, and an x-ray of the leg is considered satisfactory." *See id*.

Utilizing the information included in Dr. Roe's report, on June 4, 2015, Vocational Consultant Brian Petersen identified alternative occupations available to Plaintiff given her restrictions.  *See* AR at 636-42.

Relying on the reports of Dr. Roe and Mr. Peterson, Defendant sent Plaintiff a denial letter on June 22, 2015, explaining its decision to terminate benefits.  *See* AR at 458.  The letter stated that Defendant had "requested medical information from [Plaintiff's] known treating

---

[5] As Plaintiff points out, Dr. Roe also stated that there was a large file that he was unable to open in the CD from Social Security.  *See* AR at 113.  However, Defendant alleges, and the record supports, that the medical information on the CD was a duplicate of existing records, with the exception of one file from Lourdes Memorial Hospital.  *See* Dkt. No. 26 at 7 (citing AR at 121).

providers including Maria Iannolo MD, as well a[s] a copy of your Social Security file." *See id.* Further, the letter claimed that Defendant had reviewed the information previously contained in her file, including records from Waleed Haman MD and Brian Harley MD. *See id.* The letter summarized the medical information that Defendant reviewed before making its decision and described its understanding of Plaintiff's injuries and symptoms. *See* AR at 458-60. Defendant concluded, based on the medical records and the opinion of a Physician Consultant, that Plaintiff was capable of sedentary work activity with certain limitations. *See* AR at 463. The letter further explained why Defendant had denied coverage whereas she was eligible for Social Security benefits. *See id.*

Plaintiff's attorney sent Defendant a letter dated August 3, 2015, appealing Defendant's decision and stating that he would be sending additional medical records. *See* AR at 451. Plaintiff's attorney also provided his opinion that his client was disabled. *See id.* Defendant acknowledged the letter and welcomed Plaintiff's attorney's offer to send additional medical information. In that vein, Defendant, with Plaintiff's consent, agreed to delay its review of Plaintiff's appeal until Plaintiff's attorney had provided further information. After several months, Plaintiff only provided one additional record -- a report from Vocational Expert Josiah Pearson indicating that Plaintiff was unemployable. *See* AR at 603-05. In response, Defendant retained Dr. Rue to perform an additional independent medical review as well as Steve Cooper to perform an independent vocational review of Mr. Pearson's report.

Dr. Rue reviewed all of the medical records that Defendant had in its possession on February 22, 2016.[6] *See* AR at 80-83. Dr. Rue also attempted to contact Dr. Iannolo. *See* AR at 83.[7] Dr. Rue concluded that Plaintiff's

> supported work restrictions would be no restrictions to sitting, keyboarding, fingering or reaching at, above or below desk level, limit lift, carry, push and pull to 15 pounds frequently and 20 pounds occasionally, limit bend and twist to occasionally, no climbing, crawling, crouching or kneeling and limit stand/walk to 1 hour at a time combined for a combined total of 3 hours per 8 hour day.

*See* AR at 85.

On March 14, 2016, Mr. Cooper submitted a report that discussed Mr. Pearson's report and opined that there were jobs available that suited Plaintiff based on her functional limitations. *See* AR at 569-77

Finally, on March 15, 2016, Defendant sent Plaintiff's attorney a letter confirming its original decision. *See* AR at 426. In this letter, Defendant reiterated its process in coming to its decision and carefully explained that it had considered the evidence Plaintiff's attorney had provided.

In sum, Defendant's decision was based on the opinions of Drs. Mandiberg, Roe, and Rue, none of whom opined that Plaintiff would have any difficulty performing sedentary work. Defendant also relied on independent vocational experts. Based on the information in the administrative record, the Court finds that Defendant's decision to deny Plaintiff's LTD claim

---

[6] Dr. Rue also considered the records from Lourdes Memorial Hospital that Dr. Roe had been unable to access during his previous evaluation. *See* AR at 83.

[7] Dr. Rue also noted the lack of recent medical information that was available to review. *See* AR at 85.

was not arbitrary or capricious. Therefore, the Court grants Defendant's motion for summary judgment.

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, *see* Dkt. No. 21, is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment, *see* Dkt. No. 24, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion to include evidence outside the administrative record, *see* Dkt. No. 24, is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: May 2, 2017
      Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Judge